FILED
2023 Dec-15  PM 01:19
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **THERESA CULVERSON,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 6:22-cv-01207-ACA** |
| | ] | |
| **SOCIAL SECURITY** | ] | |
| **ADMINISTRATION,** | ] | |
| **COMMISSIONER,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Theresa Culverson appeals the decision of the Commissioner of Social Security denying her claim for a period of disability and disability insurance benefits. Based on the court's review of the administrative record and the parties' briefs, the court **WILL AFFIRM** the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Culverson applied for a period of disability and disability insurance benefits, alleging disability beginning January 15, 2021. (R. at 147). The Commissioner denied Ms. Culverson's claim and her motion for reconsideration. (*Id.* at 72–81, 83–92). Ms. Culverson then requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 105–06). After holding a hearing (*id.* at 45–71), the ALJ issued an unfavorable decision (r. at 21–39). The Appeals Council

denied Ms. Culverson's request for review (*id.* at 1–4), making the Commissioner's decision final and ripe for judicial review, *see* 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The court "review[s] de novo the legal principles upon which the ALJ relied" but reviews the ALJ's decision only for whether "substantial evidence" supports it. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1266–67 (11th Cir. 2015). "Under the substantial evidence standard, this court will affirm the ALJ's decision if there exists such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* at 1267 (quotation marks omitted). The court may not "decide the facts anew, make credibility determinations, or re-weigh the evidence." *Id.* (alterations accepted; quotation marks omitted). The court must affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted).

Despite the deferential standard for review of claims, the court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Henry*, 802 F.3d at 1267 (quotation marks omitted). Moreover, the court must reverse the Commissioner's decision if the ALJ

does not apply the correct legal standards. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## III.   THE ALJ'S DECISION

To determine whether an individual is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ must determine whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has "a severe medically determinable physical or mental impairment" or combination of impairments; (3) the impairment "meets or equals" a listed impairment; (4) in the light of the claimant's residual functional capacity, the claimant can perform past relevant work; and (5) in the light of the residual functional capacity and vocational factors, the claimant can make an adjustment to other work available in significant numbers in the national economy. *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021); *see* 20 C.F.R. § 404.1520(a)(4); *id.* § 404.1560(c)(1).

Here, the ALJ determined that Ms. Culverson had not engaged in substantial gainful activity since her alleged onset date. (R. at 23). The ALJ found that Ms. Culverson's obesity, status post remote left hip replacement with recent revision, asthma status post positive COVID-19 with pneumonia and residual effects, respiratory fibrosis, lumbar bulging disc with annular tear and mild stenosis, headache disorder, and mild multilevel cervical degenerative disc disease were severe impairments. (*Id.* at 23–24). But she found that Ms. Culverson's single

episode of major depressive disorder, hypertension, mild right knee osteoarthritis, right thumb trigger status post release, and gastroesophageal reflux disease were non-severe impairments. (*Id.* at 24–26). The ALJ then concluded that Ms. Culverson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 27–29).

After considering the evidence of record, the ALJ determined that Ms. Culverson had the residual functional capacity to perform sedentary work with some additional restrictions. (*Id.* at 29–30). Based on this residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Ms. Culverson could not perform her past relevant work. (R. at 38). But the ALJ found that other jobs exist in significant numbers in the national economy that Ms. Culverson could perform, including information clerk, billing clerk, and customer service complaint clerk. (*Id.* at 39–40). Accordingly, the ALJ found that Ms. Culverson was not disabled, as that term is defined in the Social Security Act, from January 15, 2021 through the date of the decision on December 22, 2021. (*Id.* at 39).

## IV. DISCUSSION

Ms. Culverson contends that substantial evidence does not support the ALJ's finding that she is not disabled because the ALJ (1) failed to properly consider her

headaches; (2) improperly rejected Ms. Culverson's testimony about the severity of her back pain; and (3) made the residual functional capacity determination without the assistance of an examining or treating physician. (Doc. 18 at 10–20). Ms. Culverson's first and second arguments relate to the ALJ's credibility determinations, so the court will address those arguments first, before turning to the argument about the lack of a residual functional capacity evaluation by one of Ms. Culverson's physicians.

1.  Headaches

Ms. Culverson contends that the ALJ failed to appropriately account for her headaches in the residual functional capacity assessment. (Doc. 18 at 10–13). She argues that the ALJ's only basis for rejecting her testimony about the frequency and severity of her headaches was "completely delusional." (*Id.* at 12).

According to Ms. Culverson's medical records, in mid-January 2021, she went to an urgent care facility with COVID-19. (R. at 648–49). Later that month she reported to an emergency room and was admitted with "[p]neumonia due to COVID-19 virus." (*Id.* at 552). Although some of the medical notes state that Ms. Culverson denied having a headache (*id.* at 559), the discharging physician noted that she had "[o]ther headache syndrome" (*id.* at 552; *see also id.* at 566, 572).

In February 2021, Ms. Culverson returned to the urgent care facility, complaining of shortness of breath, wheezing, and a headache. (R. at 651). She also

saw a physician for COVID-19 follow-up treatment. (*Id.* at 673–75). She did not complain of headaches at that time. (*See id.*). But later in February she complained of a headache "behind [her] eyes and forehead" that had lasted since her January COVID-19 diagnosis. (*Id.* at 676; *see also id.* at 678).

In March 2021, Ms. Culverson told her primary care physician that her headaches were "improving," though she continued to have other symptoms. (R. at 680). In April 2021, she reported headaches to a pulmonologist whom she was seeing about her continued difficulty with shortness of breath. (*Id.* at 702; *see id.* at 705).

On November 10, 2021, Ms. Culverson saw a neurologist for her headaches. (R. at 823). She told the neurologist that she had been having headaches daily since she had COVID-19 in January 2021, with terrible headaches once or twice per month. (*Id.*). The neurologist diagnosed Ms. Culverson with "tension type headaches," prescribed Elavil, ordered an MRI of her cervical spine, planned to schedule occipital blocks, and discussed weight loss. (*Id.*). The MRI showed mild multilevel disc disease. (*Id.* at 809).

At the administrative hearing in this case, Ms. Culverson testified that she has a headache "just about every day," with "really bad ones" that usually require her to stay in bed "about two, three times a month." (R. at 56–57). She testified that the "everyday" headaches prevent her from concentrating and focusing. (*Id.* at 57).

The ALJ found that Ms. Culverson's "headache disorder" qualified as a severe impairment (*id.* at 23–24), and that the impairment "could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects" were "not entirely consistent with the medical evidence and other evidence in the record" (*id.* at 30). The ALJ noted that, except for the Elavil prescription, Ms. Culverson did not have a history of treatment for her headaches and she had never visited an emergency room because of a headache. (*See* r. at 33). Her neurologist's records showed regular examination results and the cervical spine MRI conducted to rule out other causes of her headache showed mild multilevel disc disease. (*Id.*). The ALJ "note[d] that [the neurologist's] evaluation coincides with the date of the reminder of a scheduled hearing in the present case." (*Id.*).

Ms. Culverson contends that the ALJ's credibility determination "show[s] her clear bias and opinion . . . that Ms. Culverson was a liar and chose to seek treatment for headaches . . . after receiving a reminder for her scheduled hearing" despite "overwhelming[ ]" evidence of Ms. Culverson's debilitating headaches. (Doc. 18 at 11–12). This court disagrees.

The ALJ is required to articulate explicit and adequate reasons when making credibility determinations about a claimant's testimony of subjective pain or symptoms. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *see also* 20

C.F.R. § 404.1529(a) ("In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work."). And this court is bound by the ALJ's credibility determination as long as she "clearly articulate[s] explicit and adequate reasons" for the determination and substantial evidence supports it. *Dyer*, 395 F.3d at 1210–11 (quotation marks omitted.

The ALJ found that Ms. Culverson does have headaches that qualify as a severe impairment, but she also found that Ms. Culverson's statements about the intensity, persistence, and limiting effects of her headaches were not entirely consistent with the objective medical evidence. (R. at 30). She explained that she made this credibility determination based on the sparsity of medical records showing treatment for Ms. Culverson's complaints of headaches, the lack of any medical findings explaining the headaches, and the fact that the only physician to evaluate Ms. Culverson's headaches did so in November 2021, months after her alleged onset date and shortly before the administrative hearing held on December 8, 2021. (R. at

33; *see id.* at 45). The medical records confirm the ALJ's statements. (*See id.* at 206–07, 823).

Ms. Culverson spends the bulk of her argument attacking the ALJ's observation that she saw a neurologist on the same day she received a reminder about her Social Security hearing. (Doc. 11–13; *see* r. at 33). But that comment is of limited relevance to the ALJ's determination about whether the objective medical evidence supports Ms. Culverson's statements about the extent of her pain. Even disregarding it, substantial evidence supports the ALJ's conclusion. Despite how Ms. Culverson characterizes the record, her medical records do not contain overwhelming evidence of headaches so severe that they are disabling. Given the ALJ's adequate explanation, this court may not reevaluate her finding about Ms. Culverson's credibility. *See Henry*, 802 F.3d at 1267.

## 2. Back Pain

Ms. Culverson also challenges the ALJ's credibility finding with respect to her back pain. (*See* doc. 18 at 16–20). She argues that the ALJ failed to provide sufficient reasons for discrediting her testimony about the extent of her pain and that the objective medical evidence is "overwhelming." (*See id.* at 19–20).

Ms. Culverson had a hip replacement in 1996. (*See* r. at 406). In April 2019, she had a revision arthroplasty. (*Id.* at 357). After the surgery she used a walker, followed by a cane, but she weaned off both aids by July 2019. (*Id.* at 392).

In October 2020, Ms. Walker saw an orthopedic surgeon about "chronic low back and bilateral leg pain" with numbness and tingling in her lower extremities. (*Id.* at 439). A physical examination showed "a negative straight leg raise" with "full range of motion of the hips and 5/5 motor strength symmetric reflexes." (R. at 439). X-rays showed lumbar spondylosis at L5-S1. (*Id.*); *see* Spondylosis, Stedman's Med. Dictionary (2014) ("Ankylosis of the vertebra . . . ."); Ankylosis, Stedman's Med. Dictionary (2014) ("Stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint; fusion."). An MRI of the lumbar spine showed disc bulging and degenerative joint disease at L5-S1 with mild left foraminal stenosis, and left posterior lateral disc protrusion at T11-12. (R. at 442); Stenosis, Stedman's Med. Dictionary (2014) ("A stricture of any canal or orifice."); Foramen, Stedman's Med. Dictionary (2014) ("An aperture or perforation through a bone or a membranous structure.").

Ms. Walker's orthopedist referred her for a series of three steroid injections. (R. at 475). At her first appointment in October 2020, Ms. Walker reported pain on a scale of eight out of ten. (*Id.*). At her next appointment, she reported pain on a scale of five out of ten. (*Id.* at 496). At an appointment with her primary care physician in February 2021, Ms. Walker stated that the first injection had helped but the second had not; she was still experiencing low back pain. (*Id.* at 673). She said she had been "advised that she may need surgery but has to wait now." (R. at 673). At another

appointment later in February, Ms. Walker reported continuing low back pain with numbness and new upper back pain; she also again stated that "[s]urgery was postponed due to pandemic." (*Id.* at 677). Ms. Walker made similar statements in March 2021, adding only that she was afraid to have anesthesia until her respiratory condition improved. (*Id.* at 680).

In April and May 2021, Ms. Culverson complained to a doctor of low back pain radiating into her hips and legs. (*Id.* at 804, 806). A physical examination of the cervical spine showed lordosis, decreased flexion, extension, and rotation, decreased reflexes at the biceps, and decreased radius grip strength. (R. at 804, 806); Lordosis, Stedman's Med. Dictionary (2014) ("An anteriorly convex curvature of the vertebral column . . . ."). A physical examination of the thoracic spine showed increased kyphosis and tight paraspinal musculature. (R. at 804, 806); Kyphosis, Stedman's Med. Dictionary (2014) ("An anteriorly concave curvature of the vertebral column . . . ."). A physical examination of the lumbar spine showed tight paraspinal musculature, tenderness, an equivocal straight leg raise, decreased deep tendon reflexes of the patella and Achilles, and decreased muscle strength. (R. at 804, 806). Ms. Culverson's sensation was intact to light touch. (*Id.*). The doctor's impression was "degenerative spine disease osteoarthritis." (*Id.*). He prescribed Norco four times daily. (*Id.* at 805, 807).

In October 2021, Ms. Walker's primary care physician wrote a letter stating that Ms. Walker has "very limited mobility" because of lumbar disease, COVID lung disease, and chronic asthma, and that she needed lumbar spine surgery but could not undergo that operation "due to poor lung function." (R. at 808). A November 2021 cervical spine MRI showed multilevel disc disease. (*Id.* at 809). At a November 2021 appointment with a neurologist, the doctor reported that Ms. Culverson had normal muscle power, deep tendon reflexes, sensation, coordination, and gait. (*Id.* at 824).

In her application for benefits, Ms. Walker indicated that she used a cane "when needed." (*Id.* at 204). At the administrative hearing held in December 2021, Ms. Walker testified that her back pain had become "really severe within just over a year." (R. at 54). She had pain constantly, taking Norco four times daily and muscle relaxers three times daily to relieve the pain. (*Id.* at 55). She could not sit in a straight-backed chair because of the pain but could recline and use a heating pad or electric blanket for pain relief. (*Id.* at 56).

The ALJ found that Ms. Culverson's impairments could cause the symptoms she alleged but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 30). The ALJ described the medical evidence recited above (r. at 30–37) but noted that Ms. Culverson's "impairments were at the same level prior to the alleged onset date [of January 15, 2021] as currently alleged

and it did not prevent her from working." (*Id.* at 31; *see id.* at 147). The ALJ, while citing records showing Ms. Culverson had complained of back pain earlier, noted that she did not receive any treatment for back pain until April 2021. (*Id.* at 33). Although physical examinations for her back pain showed abnormalities, a neurological examination conducted in November 2021 showed normal strength, reflexes, coordination, gait, and sensation. (*Id.*). The treatment she received was conservative (r. at 36), and, despite her statements to her primary care physician, no evidence in the medical record indicated a need for surgical intervention (*id.*).

The court notes that one of the ALJ's reasons for her credibility determination was refuted by the record. Specifically, although the ALJ stated that Ms. Culverson did not receive any treatment for back pain until April 2021, the records show that she received steroid injections in October 2020. (*Id.* at 475, 496). Nevertheless, the record confirms the ALJ's other reasons for her credibility determination. *See Dyer*, 395 F.3d at 1210. Accordingly, the court is bound by the credibility determination. *Henry*, 802 F.3d at 1267. The court cannot substitute its own judgment for the ALJ's. *See Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020).

3.  Lack of a Physician's Residual Functional Capacity Assessment

Ms. Culverson contends that the ALJ erred by making a residual functional capacity assessment without the assistance of a physician who had examined or treated her. (Doc. 18 at 13–16). She argues that the ALJ's failure to order a

consultative examination meant she did not adequately develop the record. (*Id.* at 16).

"The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007). The non-binding decisions on which Ms. Culverson relies involve cases in which the ALJ lacked any residual functional capacity assessment by a physician and instead made that assessment entirely alone. *See, e.g.*, *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17–19 (1st Cir. 1996) (holding that, where the claimant had a complicated medical record involving hospital stays, tests, and multiple diagnoses, the ALJ erred by making a residual functional capacity assessment without any "analysis of functional capacity by a physician or other expert").

Even if the court followed the First Circuit's decision, the ALJ here did have the assistance of physicians: two separate consultative, albeit non-examining, physicians reviewed Ms. Culverson's medical records and did residual functional capacity assessments. (R. at 79–81, 89–90). The ALJ reviewed those residual functional capacity assessments (*id.* at 35), as well as the medical evidence in the record (*see generally id.* at 30–37), in coming to her decision about Ms. Culverson's

residual functional capacity (*see id.* at 29). This court cannot find that the ALJ "interpret[ed] raw data in a medical record" in evaluating Ms. Culverson's residual functional capacity. *See Manso-Pizarro*, 76 F.3d at 17.

## V. CONCLUSION

Ms. Culverson's challenges to the ALJ's credibility determinations and failure to order a consultative examination lack merit. Accordingly, the court **WILL AFFIRM** the Commissioner's decision.

The court will enter a separate final order consistent with this opinion.

**DONE** and **ORDERED** this December 15, 2023.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE